IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 98-50881

---

ACCESS TELECOM, INC.

Plaintiff-Appellant

versus

MCI TELECOMMUNICATIONS CORPORATION;
MCI INTERNATIONAL, INC.;
SBC COMMUNICATIONS, INC.;
SBC INTERNATIONAL, INC.;
SBC INTERNATIONAL LATIN AMERICA;
TELEFONOS DE MEXICO

Defendants-Appellees

---

Appeal from the United States District Court
for the Western District of Texas

---

December 1, 1999

Before REYNALDO G. GARZA, HIGGINBOTHAM, and DAVIS, Circuit
Judges.

HIGGINBOTHAM, Circuit Judge:


I.

During 1993 and 1994, Access Telecom, Inc. (ATI), a
corporation based in Texas, exported U.S. phone services to
customers in Mexico. These services allowed Mexican customers to
place U.S.-based phone calls directly from Mexico. Customers first

called ATI in Texas and then entered the new phone number they wanted to call. ATI dialed that new number from the U.S. and effectively spliced the customer's first call to the new call, enabling the customer to communicate with the new destination. As a result, each call had two legs: the Mexican leg from Mexico to Texas and the U.S. leg from Texas to the final destination.[1]

The benefit to ATI's customers from this arrangement was that the cost of the two-legged call was less than the cost of a normal call from Mexico through Teléfonos de México (Telmex). The price discrepancy existed because Telmex had a government granted monopoly until 1996. Thus, the rate on a typical call from Mexico to California was controlled by Telmex for its entire length. Under ATI's setup, Telmex controlled only the rate for the Mexican leg of the call. The applicable rate for the U.S. leg of the call was a U.S. rate.

The Mexican leg of each call was carried on toll free numbers that ATI received from MCI. MCI in turn leased the lines for these numbers from Telmex. In other words, MCI leased the Telmex lines that connected Mexico to Texas. Telmex's lines crossed the border into Texas where they interconnected with U.S. lines. Telmex's contracts with MCI apparently neither foresaw nor forbid the subsequent "reorigination" as practiced by ATI or other companies, and in fact, MCI offered similar reorigination services of its own.

---

[1] At some point, ATI also employed switching services in New York.

ATI's contracts with MCI incorporated the terms and conditions of MCI's U.S. "filed tariff" which provided that MCI calls may not be acquired and used for resale in foreign jurisdictions once MCI's foreign partners have blocked or interrupted MCI or have threatened to do so for such reasons. The tariff also stated that MCI was not liable for acts or omissions of other companies who furnished a portion of MCI's 800 service. Finally, the tariff prohibited the use of MCI services for unlawful purposes.

Mexican law required a permit to be a provider of telecommunications services in Mexico. ATI never obtained such a permit, maintaining it did not need to do so because it was not a provider. Under ATI's interpretation of Mexican law, a provider was an entity that both owned and operated telecommunications infrastructure within Mexico, which ATI did not do (as opposed to reselling service directly or indirectly, which ATI perhaps did do). Subsequent to the time period relevant in this lawsuit, Mexico revamped its telecommunications laws and now explicitly requires a permit to engage in resale activity.

In October 1993, Jose Rivas Moncayo of the office of the Mexican Secretary of Communications and Transportation (SCT), sent MCI a letter requesting that MCI halt the services of companies offering "call-back services." Call-back involved a procedure whereby a customer called a U.S. company, and the U.S. company did not answer the call. Instead, the company would use a form of caller-id to locate the customer and then call the customer back.

Under call-back services, Telmex received no revenue for the initial outbound call because that call was never "answered." Such services used Telmex phone lines to communicate location information without paying Telmex anything for that privilege. ATI's service, however, paid Telmex exactly what Telmex had contracted with MCI to receive for outbound calls using the lines from Mexico to Texas. ATI's service did not operate through call-back, and MCI did not terminate ATI's service. Subsequent to the time period relevant in this lawsuit, the SCT issued further communications condemning practices that achieve similar results as "call-back" services.

On April 19, 1994, Telmex notified MCI of its intention to disconnect customers who were using its service for resale. The list of 85 customers that it provided, however, did not include ATI. On April 29, 1994, MCI received another letter, requesting a list of customers in the resale business, but MCI refused to provide such a list. The letter requesting customers was written on Telmex letterhead by an employee of SBC International, a subsidiary of Southwestern Bell. Southwestern Bell is part of a consortium that owns a controlling stake in Telmex.

Telmex allegedly began disconnecting 800 numbers on July 21, 1994, without warning. Previously it had assured MCI that it would give notice of disconnection so MCI could warn MCI's customers. On September 28, 1994, Telmex sent MCI a list of prohibitions on the use of MCI's numbers, threatening to terminate all of MCI's Mexican

4

business without notice if MCI did not cooperate. ATI's numbers, save three, were disconnected on October 19, 1994; the rest were disconnected soon thereafter. At this time, ATI was earning approximately $3 million a year.

There is disagreement whether MCI provided Telmex with ATI's numbers. According to the deposition of Carol Ansley, an SBC employee, Ansley sent Rafael Perez Aguilar of Telmex a list of ATI's numbers, and Ansley testified that as far as she knew, MCI had not provided SBC with ATI's numbers. ATI, however, discovered a cover memo written by Ansley, stating that "attached you will find a list of I-800 numbers MCI has identified as being with Access Telecom." ATI also notes that John Bachman, an MCI manager, sent an e-mail on October 18, to an MCI employee, Laura Alvarado, instructing her to "take down" ATI's numbers. In Alvarado's deposition, however, she insists that she did not provide the numbers to Telmex. Even MCI has stated that the provision of ATI's numbers to third parties without permission would be in violation of U.S. law.

In an effort to continue providing service to its customers, ATI sought alternative service from AT&T. According to ATI, MCI immediately informed SBC and Telmex of ATI's attempt to obtain service from AT&T. Telmex allegedly assured MCI that ATI would not be able to reestablish the numbers through AT&T. ATI ultimately could not obtain alternate service through AT&T. ATI's business collapsed, along with approximately 80 other similar U.S.

5

companies.

II.

In June 1995, MCI commenced arbitration proceedings seeking to recover payment of ATI's phone bill, ultimately receiving an award for nearly $1.2 million. In July 1995, ATI sued Telmex, SBC, and MCI in Texas state court, alleging claims of breach of contract, tortious interference with contract, negligent misrepresentation, promissory estoppel and federal and state antitrust violations. The case was removed and transferred to the Western District of Texas. The federal court granted Telmex's motion to dismiss all claims against it for lack of personal jurisdiction.

ATI moved for partial summary judgment on the issue of the lawfulness of its activities, which the district court denied. MCI and SBC moved for summary judgment on all of ATI's claims, which the district court granted. The court held that the filed tariff doctrine barred ATI's claims for negligent misrepresentation and breach of contract. The district court granted summary judgment on a promissory estoppel claim, holding that ATI could not justifiably rely on representations by MCI as to Mexican law.

The district court also held that ATI could not recover on its claim alleging that MCI tortiously interfered with ATI's customer contracts because this was essentially a breach of contract claim and was barred by limitation of liability provisions in MCI's tariff. In addition, the court rejected ATI's claim that MCI

6

conspired with Telmex and SBC to block ATI from contracting with AT&T for service because ATI never sought or obtained a permit from the SCT and thus ATI's prospective relations with AT&T would have been illegal. Finally, the district court rejected ATI's antitrust claims on the ground that the conduct of which ATI complained did not have a direct, substantial, and reasonably foreseeable effect on U.S. domestic or import commerce or export business.

On appeal, ATI challenges the dismissal of its tortious interference and antitrust claims, the denial of summary judgment in ATI's favor with respect to the lawfulness of ATI's activities, and the dismissal of Telmex on personal jurisdiction grounds. ATI separately complains that merits discovery was improperly limited.

## III.

### A. Characterization of ATI's Business

The proper resolution of many issues in this case depends on the characterization of ATI's business. ATI characterizes its business as exporting U.S. reorigination services to Mexican customers. The defendants characterize ATI's business as providing a Mexican telecommunications service in Mexico. At first glance, the defendant's characterization has appeal. No matter how ATI's business is described, the end result enabled Mexican customers to make long distance phone calls in Mexico for prices less than those generally charged by the Telmex monopoly. This characterization,

7

however, confuses the ends with the means.

In the past, phone calls may have been seen as indivisible commodities. Today, that is too simple a view. Admittedly, by selling the "U.S. leg" of a call to Mexican customers, ATI enabled cheaper long distance communication. That is not the same as being a Mexican telecommunications provider. A distinction exists between "provider" and "reseller," which is easier to see in a more familiar context.

If ATI and Telmex were shipping companies, ATI might transport goods solely between U.S. cities. If Mexican customers shipped their goods to ATI in Texas, ATI could then transport them to another destination in the U.S. Alternatively, Mexican customers could ship directly to their final destination using Telmex alone. Shipping to New York via ATI might be cheaper, however, than shipping via Telmex. To say that ATI is a Mexican shipping provider would be imprecise. No matter which company the customer uses, Telmex, as a monopoly, is the only provider of shipping service from Mexico to Texas, and in every instance Telmex receives the previously agreed rate for its services. Thus, in Mexico, ATI is at most a reseller of Telmex's shipping service, although even the label of "reseller" is debatable.

To equate resale with provision, however, entails that every business is a provider if that business ships goods to its customers via Telmex and charges the customer for the shipping cost. In our case it would entail that every business which has a

8

toll free number, yet which charges the cost of the phone service back to the customers, is a telecommunications provider because it technically is "reselling" phone service. This ignores the crucial difference between resellers and providers, which is that a reseller cannot compete with a monopoly provider because the provider is the reseller's only supplier. The reseller can only undersell the provider if the provider sells its services to the reseller for less than they are worth. That is not the same kind of competition a provider faces against another provider. Competition between the provider and the reseller is at the mercy of the provider and the provider's knowledge or ignorance of the market.

Because of this difference, it is more appropriate to characterize ATI as an exporter of U.S. phone services who incidentally and indirectly resold Mexican telecommunications services. In a real sense, ATI was not even the primary reseller of Mexican telecommunications services. MCI was the reseller, under contract from Telmex. ATI purchased MCI's services and MCI billed ATI for the calls made to ATI's numbers by ATI's customers who were purchasing U.S. service. ATI may have recouped the cost of the Mexican leg of the call from its customers just as any other business may recoup the cost of toll free phone service through its service fees. ATI's setup is thus the same as any American business which contracted to offer toll free 800 numbers to Mexican customers in order to provide service across the phones, such as

9

touch tone brokerage service or even $3.95/minute astrological advice. The only difference is that ATI offered U.S. phone service rather than another service delivered by phone. While this may make ATI appear to be a Mexican "provider," this ignores the foregoing distinctions. To not distinguish between direct providers, direct resellers, and indirect resellers ignores the competitive reality that it is the providers who determine whether subsequent resales are profitable; it also leads to the illogical result that all businesses are telecommunications providers. This characterization of ATI's business is compatible with one interpretation of the laws which were in place in Mexico at the time, requiring permits only for the joint installation, operation, and exploitation of infrastructure. ATI's claim that the "and" has its normal conjunctive meaning agrees with these distinctions, because this reading separates true providers from mere resellers. With these distinctions in mind, we now address the tortious interference issues.

## B. Tortious Interference

### 1. Choice of Law

To properly decide the tortious interference issues, we must make three choice of law decisions: first, which law governs ATI's tort cause of action; second, which law governs the validity of the contracts and prospective business relations which form the basis of the tortious interference claims; and third, whether any foreign law invalidates the contracts for other reasons. A federal district

court must follow the choice-of-law rules of the state in which it sits. <u>See, e.g.</u>, <u>St. Paul Mercury Ins. Co. v. Lexington Ins. Co.</u>, 78 F.3d 202, 205 (5th Cir. 1996).

(a)  Tort Choice of Law

The first choice is which law governs ATI's tort cause of action. Texas follows the most significant relationship test of the Restatement (Second) of Conflict of Laws § 145, for these decisions.  <u>See</u> <u>Gutierrez v. Collins</u>, 583 S.W.2d 312, 318 (Tex. 1979).  Under the modern "most significant relationship" test, courts considers: (1) the place where the injury occurred; (2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (4) the place where the relationship between the parties, if any, is centered.  <u>See</u> <u>SynderGeneral Corp. v. Great Am. Ins.</u>, 928 F. Supp. 674, 677 (N.D. Tex. 1996), <u>aff'd</u>, 133 F.3d 373 (5th Cir. 1998).  Since Texas was the site of injury, home to the injured business, and place of export of the U.S. portion of the business, it would be reasonable to apply Texas law; however, the parties appear to assume without argument that Texas law governs, and so, without deciding, shall we.

Thus, we examine Texas law to determine the requirements for a tortious interference claim.  Under Texas law, the existence of a valid contract (or the potential for one in claims for

11

interference with prospective contracts) is an element of a claim for tortious interference. See Juliette Fowler Homes, Inc. v. Welch Associates, Inc., 793 S.W.2d 660, 665 (Tex. 1990). There is no remedy for interference with illegal contracts, see Ben E. Keith Co. v. Lisle Todd Leasing, Inc., 734 S.W.2d 725, 727 (Tex. App.-Dallas 1987, writ ref'd n.r.e.).

(b) Contract Choice of Law

The ATI contracts at issue in this case include ATI's contracts with its Mexican customers, ATI's contracts with MCI, and ATI's attempted contracts with AT&T. The second choice of law question arises because we must determine whether these contracts were valid. Validity of a contract, however, is determined by the law which governs the contract, which calls for another choice of law analysis, this time using the modern "most significant relationship" test of the Restatement (Second) of Conflict of Laws as applied to contracts, which Texas has adopted. See Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 420-21 (Tex. 1984).

ATI, based in Texas, exported Texas reorigination services to Mexican customers and resold Mexican telecommunications service. These customer contracts had choice of law provisions identifying Texas as the applicable law and place of formation. In Texas, contractual choice-of-law provisions are ordinarily enforced if the chosen forum has a substantial relationship to the parties and the transaction. See De Santis v. Wackenhut, 793 S.W.2d 670, 677-78

12

(Tex. 1990). However, a choice-of-law provision will not be applied if another jurisdiction has a more significant relationship with the parties and their transaction than the state they choose, that jurisdiction has a materially greater interest than the chosen state, and the jurisdiction's fundamental policy would be contravened by the application of the law of the chosen state. See Restatement (Second) of Conflict of Laws § 187.

The defendants argue that the choice of law clauses in the ATI customer contracts are not determinative, because these contracts concerned issues of payment and formation, mostly stating that the contracts were formed in Texas and would be payable in Texas in U.S. dollars. The contracts did not concern the terms of ATI's actual provision of service. It is true that contractual choice of law clauses are construed narrowly. See Thompson and Wallace of Memphis, Inc. v. Falconwood Corp., 100 F.3d 429 (5th Cir. 1996). However, the defendants' argument cuts both ways. To the degree that these contracts do not concern the services allegedly illegal in Mexico, it becomes harder to argue illegality of those contracts under Mexican or Texas law; furthermore, so long as these contracts were interfered with, the fact that a separate service agreement was not interfered with does not matter, since the interference claim only needs one contract as its basis.

Without deciding how determinative the choice of law clauses are, however, it appears that there is no demand to choose Mexican over Texas law under a most significant relationship test. The

13

Restatement § 188 states that

> [i]n the absence of an effective choice of law by the parties . . . the contacts to be taken into account . . . to determine the law applicable to an issue include: (a) the place of contracting; (b) the place of negotiation of the contract; (c) the place of performance; (d) the location of the subject matter of the contract; (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

In this case, we have a very symmetric relationship between the parties and the services provided. Each forum is home to one of the parties, one forum's business is exporting services, the other forum's resident is receiving services, the U.S. favors competition in telecommunications, Mexico at the time did not. ATI's indirect resale of the Mexican leg of the service may center in Mexico, but even a portion of that service occurs in Texas, since Telmex's lines cross into Texas and interconnect at the border. Further, that service was provided by MCI under agreements with Telmex and ATI, and the ATI-MCI agreements were entered into in Texas. Even assuming the Mexican leg of the calls implicates Mexican interests more than Texas interests, the remaining contacts that ATI's contracts had with Texas, including the choice of law clause which is of some weight, is at least a deciding factor in such a close case.

This makes sense if one looks at the fundamental policies involved, which include Mexico's interest in a domestic telephone monopoly. Mexico would not have a fundamental policy contravened

14

by the application of Texas law in this case. The export of U.S. telecommunication services and even the resale of Mexican services does not contravene Mexico's legitimate monopoly over its domestic lines. Telmex can charge whatever it likes for incoming and outgoing calls on its lines. The resale of the Mexican leg either directly by MCI or indirectly by ATI is only profitable if Telmex allows it to be. If Telmex sets a monopoly price for its initial service, Telmex recoups all potential monopoly revenues from that fee. Telmex may wish to use its monopoly as leverage in order to gain higher revenues from the U.S. leg of calls, but attempts to tie domestic monopoly power into the international market is not within the scope of the domestic monopoly. As such, it is not a Mexican interest which tips the scale in Mexico's favor.

Texas, on the other hand, would have a fundamental policy contravened by the choice of Mexican law (assuming Mexican law is different on the question of contract validity), namely the ability of Texas companies to make valid export contracts in Texas for the sale of U.S. services.

The remaining contracts and prospective contracts are more obviously governed by Texas law. ATI's contracts with MCI were negotiated and entered into in Texas, between Texas businesses. ATI's potential contracts with AT&T presumably would have been similar. In this case, Mexico's only connection with these contracts is the fact that the contracts involve the use of Mexican lines for a portion of the calls. Given the fact that the parties

15

are in the U.S., the contracts were made in the U.S., and that there is no claim that these contracts were illegal under Mexican law, there seems to be no reason to choose Mexican law to determine the validity of these contracts, despite the fact that part of their subject matter existed in Mexico.

We hold, then that Texas law determines the validity of the contracts and prospective contracts at issue in this case. However, this is still not the end of the analysis.

(c)  Foreign Law Which Invalidates Contract Under Texas Law

Under Texas contract law, it is "well settled" that "[a] contract made 'with a view of violating the laws of another country, though not otherwise obnoxious to the laws either of the forum or of the place where the contract is made,' is illegal and 'will not be enforced.'" See Ralston Purina Co. v. McKendrick, 850 S.W.2d 629, 639 (Tex. App. – San Antonio 1993, writ denied) (quoting San Benito Bank & Trust Co. v. Rio Grande Music Co., 686 S.W.2d 635, 638 (Tex. App. -- Corpus Christi 1984, writ ref'd n.r.e.)).

This rule has not been analyzed by the Texas appellate courts which have relied on it, and the Texas Supreme Court has not adopted this rule expressly.[2]  "To determine state substantive law,

---

[2] "Writ refused, n.r.e." is not the same as "writ refused," in the writ history of Texas appellate cases.  Only an unqualified "writ refused" must be treated as on equal footing with other Texas Supreme Court precedent.  See Texas Jurisprudence, 3d § 145.

we look to final decisions of the state's highest court." <u>Shanks v. AlliedSignal</u>, Inc., 169 F.3d 988, 993 (5th Cir. 1999) (<u>citing</u> <u>Transcontinental Gas Pipe Line Corp. v. Transportation Ins. Co.</u>, 953 F.2d 985, 988 (5th Cir. 1992)).  "'When there is no ruling by the state's highest court, it is the duty of the federal court to determine as best it can, what the highest court of the state would decide.'" <u>See id.</u> (quoting <u>Transcontinental</u>, 953 F.2d at 988). Thus, we must make a guess as to how the Texas Supreme Court would interpret this rule.  Because the Texas Supreme Court has chosen to follow modern choice of analysis, we proceed with that background assumption.  As such, there are two aspects to this rule that must be discussed before it can be applied.

The first aspect is the rule's tacit assumption that foreign law is relevant to the contract in question. For example, there is no reason to suspect Texas courts would deem void a contract between Texans for the sale of cheese in Texas, even if Mexican law purported to make all sales of cheese illegal, even those occurring in Texas.  Mexican law would be inapplicable to the contract in question because Mexico has no legitimate interest in the contract. The second aspect to consider is the meaning of "with a view." First, we discuss the rule's assumption that foreign law is relevant.

Historically, the assumption that the laws of a foreign country were relevant or applicable to a contract was justified if the contract was to be performed in the other country because place

17

of performance or place of contract decided the choice of law question.  See 6 WILLISTON ON CONTRACTS § 1749 (1938).  Moreover, "good morals and the obligations of international comity demand denial of judicial sanction to the intentional breach of . . . the general laws of a friendly state."  Id.  Under modern choice of law analysis, however, place of performance or place of contract formation is not always determinative.  Furthermore, principles of comity only extend so far.  See Republic of Philippines v. Westinghouse Elec. Corp., 43 F.3d 65, 75 (3d Cir. 1994)  (noting that comity "must yield to domestic policy" and "cannot compel a domestic court to uphold foreign interests at the expense of the public policies of the forum state").

As stated, modern choice of law analysis in Texas applies the law of the forum with the "most significant relationship" to the contract in question.  Duncan v. Cessna Aircraft Co., 665 S.W.2d 414, 420-21 (Tex. 1984).  Thus, a contract legal in the U.S. may be illegal in Mexico, yet under choice of law analysis, Mexican law might not be chosen to apply.  If Mexican law does not apply to determine validity, then to say the contract is illegal in Texas because it violates Mexican law reverts too quickly back to a discarded conclusion, a conclusion rooted in the traditional assumption that Mexican law always has an interest in the contract if some aspect of the contract is illegal under Mexican law.

There are at least two reasons to defer to foreign law, however, even if that law would not be chosen to govern the

18

contract. First, a contract legal in the U.S. and illegal in Mexico may places parties in a dilemma. They can either perform the contract and face Mexican liability (Mexico, after all, may have personal jurisdiction over the parties). On the other hand, the parties can breach the contract, but then face U.S. liability for contract damages. This dilemma, however, is not implicated in tortious interference claims, because by definition, the defendant is not a party to the original contract and thus need not choose between breaking foreign law or facing U.S. liability. A dilemma only exists to the third party if foreign law gives the third party a duty or right to interfere. No duty is alleged in this case with respect to MCI and SBC and the right to interfere (privilege) is addressed below.

A second, but more important, reason to defer to foreign law even if it does not apply to the contract is the mentioned principle of comity, which suggests that the U.S. should respect Mexican law on a kind of "golden rule" basis. The leading Texas case demonstrates this situation although without this explicit reasoning. See Ralston Purina Co. v. McKendrick, 850 S.W.2d 629 (Tex.App.-San Antonio, 1993). In Purina, a contract to export goods into Mexico was found illegal in Texas because the parties were smugglers who did not have the necessary Mexican licenses. Id. at 639. Even if Texas law applied to that contract under a most significant relationship test, the principle of comity would

19

be a strong basis to hold the Texas contract illegal under Texas law, and thus not a basis for a tortious interference claim. If there is no dilemma and there is no basis for comity, however, the old rule makes no sense under modern choice of law analysis which already takes into account the interests of the various fora. To allow foreign law to jump back in and change the conclusion circumvents the principles behind the original choice of law.

The second aspect of the rule that must be analyzed is what "with a view" means. The language implies the existence of an intention on the part of at least one of the parties to violate foreign law. It is unclear whether the rule requires both parties to have illegal intentions, as it has been remarked that one party's mere knowledge of the other's illegal intentions is insufficient to void a contract. See International Aircraft Sales, Inc. v. Betancourt, 582 S.W.2d 632, 635 (Tex.Civ.App.-Corpus Christi May 31, 1979, writ refused n.r.e.). If intention did not matter, the rule could merely state that contracts which violate foreign law are illegal. The policy behind this part of the rule appears to be that it is against the public policy of the domestic forum to encourage willful attempts to break foreign law. Given these considerations, however, it makes no sense to apply the rule if there is no intention of either party to violate foreign law. More importantly, however, if foreign law is sufficiently unclear as to the legality of certain actions, then it is unreasonable to say the parties entered the contract with a view to violate

20

anything.

Because the Texas Supreme Court has not addressed these issues, we consider how the court might decide the first issue, and we decide that when a contract governed by Texas law violates the laws of a foreign country, that violation does not void the contract for purposes of tortious interference claims if the foreign policies at issue do not demand comity. In this case, if Mexican law banned the import of U.S. switching services or the incidental resale of Mexican capacity by a non-provider, it would be a policy designed to increase the monopoly power of a domestic company outside the territorial boundaries of that country. Such policies do not demand comity. It would not be the case of a country banning an import which is arguably injurious to the health or morals of its citizens, such as toxic waste or pornography. Instead, if ATI's activities were illegal in Mexico, then it would be an example of a country banning the import of a competitive service for which no legitimate monopoly exists. While it is fine for a country to take a protectionist position, the legality of U.S. contracts need not turn on it.

Because there is no "dilemma" alleged in the current case with respect to third parties being forced to choose between U.S. contract damages and Mexican liability, we do not decide the effect of such a dilemma on the rule.

Thus, even if Mexican law prohibited the resale of already resold telecommunications services or prohibited the importing of

21

U.S. telecommunications services, these facts do not serve as a defense to a claim of tortious interference with such contracts in situations when the alleged tortfeasor is not forced to choose between violating foreign law or suffering U.S. liability, when Texas law otherwise governs the underlying contracts and torts.[3]

An alternative basis to decide this issue, of course, would be that contracts entered "with a view" to violate foreign law are not void for the purposes of tortious interference claim if neither party to the contract had illegal intentions. An illegal intention is not shown in this case, at least for the purposes of summary judgment. As shown below, Mexican law at the time was sufficiently unclear and capable of multiple interpretations as to what was or was not legal. Such difficulty in interpreting foreign law makes it unreasonable to conclude any contract was entered with a view to violate foreign law. The fact that ATI attempted to get a permit "just in case," does not prevent them from successfully arguing that their service was legal and they believed it was legal. While the content of foreign law is a legal question, the question of ATI's intention is not, and there is sufficient evidence to permit a jury to conclude ATI was acting with the view that their services were legal; as such, summary judgment against

---

[3] For the purposes of this analysis, it is assumed that the SCT's refusal of a permit to ATI suffices to show exclusion from the Mexican market. This assumption is made without deciding that such a refusal shows a permit was legally required, but only that one was not readily available. Had one been easily available and a mere "formality," then it would not make sense to characterize Mexican law as protectionist.

ATI on the tortious interference claims would be improper unless ATI's activities were illegal under U.S. law or subject to another defense, as discussed below.

## 2. Validity Under U.S. Law

It remains to determine whether ATI's contracts and services were illegal with respect to U.S. law. The defendants assert that ATI's activities were contrary to 47 U.S.C. § 214, which requires authorization before a carrier "shall undertake the construction of a new line or of an extension of any line, or shall acquire or operate any line, or extension thereof, or shall engage in transmission over or by means of such additional or extended line." ATI, however, merely provided a service that connected different lines and did not itself construct any new lines. Section 214 applies only to the construction of facilities and does not prevent carriers from offering new services. See MCI Telecommunications Corp. v. FCC, 561 F.2d 365 (D.C. Cir. 1977).

Furthermore, even with respect to call-back, a practice truly hostile to a legitimate domestic monopoly, the FCC decided in 1995 that even call-back did not violate U.S. or international telecommunications law and only prohibited the service on comity grounds where "expressly prohibited" in the foreign country. In re VIA USA, Ltd., 10 FCC Rcd. 9540 ¶¶ 50-51 (1995). Thus, during 1993 and 1994, there was no basis to deem call-back, let alone reorigination, illegal under U.S. law.

23

### 3. Other Tortious Interference Defenses

The defendants also support the entry of summary judgment in their favor on a number of alternative legal grounds, including federal preemption, the terms of MCI's tariff, Texas tortious interference doctrine, and privilege.

(a) Privilege

First, the defendants assert that they are protected by the common law defense of privilege. The Texas Supreme Court has explained this defense thus:

> Under the defense of legal justification or excuse, one is privileged to interfere with another's contractual relations (1) if it is done in a bona fide exercise of his own rights, or (2) if he has an equal or superior right in the subject matter to that of the other party. One may be privileged to assert a claim even though that claim may be doubtful, so long as it asserted a colorable legal right. However, the defense of legal justification or excuse only protects good faith assertions of legal rights.

Victoria Bank & Trust v. Brady, 811 S.W.2d 931, 939-40 (Tex. 1991).

The Restatement, cited as authority in Victoria Bank, explains that the defense "protects the actor only when (1) he has a legally protected interest, and (2) in good faith asserts or threatens to protect it, and (3) the threat is to protect it by appropriate means." Restatement (Second) of Torts § 773.

MCI did have a legal right to halt MCI's service with ATI if Telmex threatened to cut off MCI's service. That right was based on the MCI's contract with ATI. But ATI's tortious interference

24

claim is not based on MCI halting ATI's service; it is based on MCI giving away ATI's confidential information. As such, ATI's claims concern actions which cannot be traced to legal rights stemming from a contract or domestic or foreign law. If MCI "disclose[d] the business or application(s) of [its] customers," it was in violation of U.S. law, according to MCI's correspondence with Telmex.[4] MCI maintains that it was trying to protect its interest in its contract with Telmex, and to ensure that AT&T was not receiving illegal preferential treatment from Telmex. The problem with MCI's argument is that the tortious interference was allegedly accomplished through improper release of confidential information. Release of nonconfidential information may be a basis for privilege. See Restatement (Second) of Torts § 773 illus. 1. The release of confidential information, however, is not an "appropriate means" to protect other interests.

If Telmex cut off ATI's service as alleged, it might have been against Mexican law, but whether or not it was, Telmex's privilege is not before us, except insofar as SBC attempts to claim it by virtue of SBC's part ownership of Telmex. SBC maintains that it was protecting the interests of its affiliated company Telmex. However, SBC is only a 10% owner of Telmex and there is evidence which a factfinder could find that SBC's actions in helping Telmex and MCI shut down ATI were as much for SBC's benefit as its own

---

[4] Neither side cites the regulation that such disclosure violates; however, no party disputes that such disclosure is illegal without permission.

entity rather than as an agent of Telmex, given that SBC intended to independently enter ATI's market. Because there is not a completely obvious "unity of interest" between SBC and Telmex, summary judgment on SBC's privilege defense is inappropriate. Thus, there is no basis on which to rest a defense of privilege for SBC and MCI at the summary judgment stage.

(b) Preemption

MCI argues that its filed tariff preempts ATI's Texas tort claims because of the federal "filed-rate doctrine." Many cases speak about federal preemption of state claims when there are filed tariffs. See, e.g., Marcus v. AT & T Corp., 938 F. Supp. 1158 (S.D.N.Y. Aug 21, 1996), aff'd, 138 F.3d 46 (2d Cir. 1998) (holding the following claims preempted: deceptive acts and practices, false advertising, fraud and deceit, negligent misrepresentation, breach of warranty, and unjust enrichment by failing to disclose that customers were billed per minute rounded up to the next higher full minute for long distance services). The leading and controlling case in this area for our purposes is AT&T v. Central Office Telephone, Inc., 118 S. Ct. 1956 (1998), In which the Supreme Court expounded on the filed-rate doctrine.

Central Telephone, a bulk reseller of long distance services purchased from AT&T, sued AT&T, alleging breach-of-contract and tortious interference claims. Under the filed-rate doctrine, federal law preempts claims concerning the price at which service

26

is to be offered, and the Supreme Court ruled that it also preempts claims concerning the services that are offered. See id. at 1962-64. The Court thus found the breach-of-contract claims preempted. The Court also found the tortious interference claim preempted, but only because that claim was "wholly derivative of the contract claim for additional and better services." Id. at 1964. The tortious interference claim alleged that AT&T's refusal to provide certain types of service led to interference of Central Telephone's contracts with its customers. See id. at 1964-65. It was thus not protected by the saving clause of the Communications Act. See id. at 1965 ("A claim for services that constitute unlawful preferences or that directly conflict with the tariff—the basis for both the tort and contract claims here—cannot be 'saved' under § 414.").

ATI's tortious interference claims are different. It does not allege that MCI stopped providing service, resulting in ATI being unable to meet customer demand. Rather, ATI alleges that MCI released confidential information, first to Telmex and then to AT&T. This information ultimately led those parties to deny service to ATI. This claim is not derivative of a contract claim. It does not concern the provision of services which are covered by the filed tariff, but rather it concerns illegal actions outside the scope of the tariff and not derivative of any phone services. Therefore, the filed rate doctrine does not preempt ATI's tortious interference claims.

27

(c)  Filed Tariff

MCI argues that its filed tariff precludes liability because there is a contractual provision stating that MCI may halt service if a situation arose involving threats from the third party partner.  This only goes to whether MCI breached its contract with ATI, not whether MCI breached duties imposed outside of the contract, as alleged by ATI, and thus this argument fails as a defense to tortious interference.  The right to halt one contract does not grant the right to interfere with another by any conceivable means.  MCI may well have been entitled to cut off service to ATI once Telmex threatened it with cutting off international 800 service.  But the provision did not authorize MCI to respond to such threats by helping Telmex cut off ATI, or by preventing ATI from having a contractual relationship with AT&T.


(d)  Breach of Contract

MCI argues that ATI's tortious interference claims are nothing more than claims that MCI breached its contract with ATI, and as such are precluded from serving as the basis of tortious interference claims.  Under Texas law, "the general law is that where a defendant's conduct breaches an agreement between the parties and does not breach an affirmative duty imposed outside the contract, the plaintiff ordinarily may not recover on a tort claim if the damages are economic losses to the subject matter of the

28

contract." <u>National Union Fire Ins. Co. v. Care Flight Air Ambulance Serv., Inc.</u>, 18 F.3d 323, 327 (5th Cir. 1994). However, this does not mean tort damages cannot be measured by economic losses from the contract. <u>See</u> <u>American National Petroleum Co. v. Transcontinental Gas Pipeline Corp.</u>, 798 S.W.2d 274 (Tex. 1990) (allowing recovery for exemplary damages for tortious interference claim when damages from the tort were the same as economic damages from breach of contract). Furthermore, it is obvious that ATI's claims are not breach of contract claims, but rather are allegations that MCI breached duties imposed affirmatively outside the context of the ATI-MCI contracts. Thus, this defense fails as well.

(e)  No Issue of Material Fact

Finally, MCI argues that there is no evidence that MCI actually gave ATI's numbers to Telmex. There is at least a material issue as to this fact, however, and summary judgment is inappropriate. The fact that MCI and MCI's employees say they did not give away the numbers flies square in the face of the memoranda and communications discovered by ATI which suggest that MCI planned to and did do just that.

C. Federal and State Antitrust Claims

1. Prima Facie Showing

The district court dismissed ATI's federal and state antitrust

29

claims because the court failed to find a relevant U.S. market.  In order to support an antitrust claim, there must be actions which have a reasonably foreseeable effect in a defined U.S. market.  See 15 U.S.C. § 6a; Hartford Fire Insurance Co. v. California, 509 U.S. 764, 796 (1993) (allowing Sherman act recovery for foreign conduct that produces "some substantial effect in the United States").

ATI asserts that there was a direct and substantial effect on trade or commerce, and second that it was engaged in export trade. The substantial effect that ATI identifies is that its own business, as well as that of other companies, failed, "resulting in an inability to sell its U.S. telephone switching services to all Mexican customers."  The alleged actions by Telmex and the other defendants were aimed at shutting down this market.  It is clear that the U.S. export market for reorigination services was a definite and sizable export market, and the failure of these 80 businesses is clearly an effect on export trade from the United States.  The market is significant, with ATI's annual revenues alone reaching $3 million/year at the time the events occurred. Under 15 U.S.C. § 6a, the antitrust laws do "not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless . . . such conduct has a direct, substantial, and reasonably foreseeable effect . . . on trade or commerce which is not trade or commerce with foreign nations, or on import trade or . . . export trade . . . with foreign nations."  By showing a significant effect on a U.S. export

30

market, ATI meets the export trade exception.[5]

For the purposes of the antitrust inquiry, however, it matters whether the importation of these U.S. services was legal under Mexican law. If the importation of these services was illegal, there is no legal export market to Mexico. If there is no legal U.S. export market to Mexico and the only U.S. export market affected is the Mexican market, then there is no antitrust injury. Cf. <u>Matsushita Elec. Ind. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 582 (1986) ("American antitrust laws do not regulate the competitive conditions of other nations' economies."). In other words, foreign countries may make laws or create monopolies that effectively and completely exclude U.S. import competition. That does not then mean that U.S. companies can enter the market anyway and make antitrust claims when things do not work out. Even in the U.S., the existence of a legitimate government granted monopoly precludes claims of antitrust violation when a plaintiff wants to compete in the regulated market. <u>See</u> <u>Alameda Mall, Inc. v. Houston Lighting & Power Co.</u>, 615 F.2d 343 (5th Cir. 1980).

---

[5]This is not to say that the factfinder could not ultimately conclude that the relevant market for antitrust liability is the Mexican long-distance market. Our characterization of Telmex's business and our determination that the actions of Telmex and the other defendants had a "direct, substantial, and reasonably foreseeable effect" on the U.S. export market for switching services does not preclude the factfinder from making an independent determination of the relevant market for the purposes of antitrust liability. <u>Cf.</u> <u>Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc.</u>, 123 F.3d 301, 311 (5th Cir. 1997).

31

This is not inconsistent with our holding that contracts for reorigination services may still serve as the basis for tortious interference claims. For the purposes of antitrust law, the threshold choice of law determination always validates a foreign government's right to determine whether outsiders can compete. As we have held, however, this choice of law is not mandated by the law of tortious interference. Admittedly, this is a "conflict" within U.S. law, but not one we need to resolve.

ATI challenges the district court's award of summary judgment against it on its antitrust claims against SBC and MCI. Because we find that ATI's services were legal under the law of Mexico at the relevant time, anticompetitive means of stopping such service may violate U.S. antitrust laws.

## 2. Legality of ATI's Operations Under Mexican Law

The content of foreign law is a question of law and is subject to de novo review. <u>See</u> Fed. R. Civ. P. 44.1; <u>Perez & Compania v. M/V Mexico I</u>, 826 F.2d 1449 (5th Cir. 1997). "The court, in determining foreign law, may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under Rule 43." Fed. R. Civ. P. 44.1. Under this rule, expert testimony accompanied by extracts from foreign legal material is the basic method by which foreign law is determined. <u>Republic of Turkey v. OKS Partners</u>, 146 F.R.D. 24, 27 (D. Mass. 1993). It is not, however, "an invariable necessity in establishing

foreign law, and indeed, federal judges may reject even the uncontradicted conclusions of an expert witness and reach their own decisions on the basis of independent examination of foreign legal authorities." Curtis v. Beatrice Foods Co., 481 F. Supp. 1275, 1285 (S.D.N.Y.), aff'd mem., 622 F.2d 203 (2d Cir. 1980). Likewise, differences of opinion among experts on the content, applicability, or interpretation of foreign law do not create a genuine issue as to any material fact under Rule 56. Banco de Creditor Indus., S.A. v. Tesorreria General, 990 F.2d 827, 838 (5th Cir. 1993). In general, summary judgment is appropriate to determine the content of foreign law. See 9 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE CIV.2D § 2444.

At issue is the legality of ATI's business under Mexico law. Under Mexican law at the time in question, a government concession or permit was required in order to provide telecommunications services in Mexico. It is undisputed that ATI had no permit or concession from the Mexican government. What is disputed is whether ATI's business was within the scope of this law. ATI makes the argument that at the time in question, the relevant regulatory provisions envisioned the concession requirement to only apply to entities who were providers of telecommunications services in that they owned, installed, operated, and exploited telecommunications infrastructure in Mexico, with emphasis on the "and." The defendants argue that a permit is required to install, operate, "or" exploit telecommunications infrastructure in Mexico, with

33

emphasis on the "or," and because ATI exploited the infrastructure, they needed a permit. The defendants also argue that all "resellers" needed permits.

ATI rests primarily on the deposition of Miguel Orrico Alarcon, who was head of SCT legal counsel for 33 years. Orrico, who is said to have drafted, applied, interpreted and enforced the provisions at issue, explained that Mexico's statutory definitions of a "provider" of telecommunications service is limited to those that install, operate, <u>and</u> exploit the network. Because ATI did not install a network, and because special significance is attached to the conjunctive language of the statute, ATI was not a provider and therefore was not regulated under these provisions. Mexican law changed subsequent to the time at issue in this case, and now resellers explicitly are required to obtain permits.

The defendants focus on Moncayo's letter and on the Secretary of Communications and Transportation's Official Circular Letter 119-1900. Moncayo's letter is of little value, because it directly discusses only "call-back" services, which ATI's was not. The Official Circular, however, condemns such services in addition to "other similar or equivalent procedures with the same purpose." The Circular concludes that such services are "rendered outside the legal provisions established by the Federal Law on Telecommunications, in view of the exclusive nature of the right granted to Teléfonos de México until August 1996 for rendering basic national and international long distance service."

34

The defendants maintain that the Official Circular is entitled to deference by this court as an agency's interpretation of the laws which it administers and enforces, citing Chevron U.S.A., Inc. v. Natural Resources Defense Council, 467 U.S. 837 (1984). ATI counters that the official circulars in fact have no legal effect, and that in Mexico, only federal courts have the power to issue resolutions determining the legality or illegality of acts. Moreover, ATI emphasizes, only the General Bureau of Judicial Matters has the sole power to "establish and systematize" the legal criteria concerning the application of legal and regulatory provisions, not Mr. Moncayo's office.

Recognizing the difficulty of interpreting foreign law, courts may defer to foreign government interpretations. The Seventh Circuit reached this conclusion in deferring to an administrative agency in France, a civil law country. See In re Oil Spill by the Amoco Cadiz, 954 F.2d 1279, 1312 (7th Cir. 1992) ("A court of the United States owes deference to the construction France places upon its domestic law . . . . Giving the conclusions of a sovereign nation less respect than those of [a U.S.] administrative agency is unacceptable.").

In Amoco Cadiz, the court was faced with conflicting interpretations of French law. The court noted that had the litigants been private parties, it would have had to resolve the conflicts. See id. at 1312. Because the Republic of France was before the court, however, the Seventh Circuit accepted its

35

interpretation of the law.  See id.  The Republic of Mexico is not a litigant before this court and neither is the SCT.  And while the evidence shows that the SCT was empowered to enforce Mexican law, it does not persuasively show that the SCT was empowered to interpret Mexican law.  The fact that U.S. courts routinely give deference to U.S. agencies empowered to interpret U.S. law and U.S. courts may give deference to foreign governments before the court does not entail that U.S. courts must give deference to all agency determinations made by all foreign agencies not before the court.  More importantly, the most relevant official circular at issue is dated 1996, after the new laws went into effect; thus, it is unclear whether the SCT position was that such activities were currently illegal or had always been illegal.  For these reasons, we do not feel compelled to credit the SCT's determinations without analysis.

The defendants also argue that the relevant regulations required a permit to be a reseller.  The statute in question, however is not without question.  Our English translation of Article 75 of the Telecommunications Rulings of Mexico reads as follows:

> The exploitation of the telecommunications network given in concession must be carried out directly by its holder and its commercialization may be made through agents in accordance with the provisions approved by the Ministry.

We read this to mean that the direct operation of the network must be accomplished by the actual provider, and that the provider

36

may designate others to commercialize the network.  It does not say commercialization "must" be made through those channels, however.  Furthermore, this court has not been apprised of the content of any "Ministry provisions," and the defendants have not identified any regulation in place at the time which defines or regulates "resale" or explicitly requires a permit for anything except provision, which we have already decided ATI was not doing.  Instead, we find convincing the argument that before the new laws took effect, only the direct provision of telecommunications services required a concession from the Mexican government, for several reasons.

First, because ATI's method was novel, it is unrealistic to read the older Mexican law as covering the service.  The new laws explicitly regulate resale and pointedly are not retroactive; this is at least some evidence supporting the notion that permits were not previously envisioned.

Second, Mexico's concession to Telmex specifically authorized Telmex to resell any excess capacity, even before 1996, although it did not require it to do so.  Thus, what appears to be the case is that Telmex resold capacity to MCI not realizing the boon it would be for others to use that capacity with additional U.S. services attached.

Third, a conclusion that any Mexican resale is covered by the older, vague provisions would entail that every U.S. or Mexican business with a toll free number would have been required to have a permit because they "resell" Mexican phone service as much as ATI

37

did whenever they charge the cost of call-back to the caller through their service fees. The fact that laws could try to distinguish between resellers "primarily" engaged in resale versus those "incidentally" engaged in resale does not change the fact that the relevant laws are not so explicit.

Fourth, to say that any Mexican resale required a permit would have invalidated MCI's contracts with Telmex insofar as neither MCI nor Telmex has indicated that MCI had a permit. While it is not necessary for either defendant to show its own conformity with Mexican law, it adds skepticism to their argument that a permit was required or even envisioned and lends credibility to the view that what happened in this case is that Telmex made a bad bargain with MCI and wanted to get out of it. Telmex's contract with MCI might have purported to restrict MCI's subsequent use of the lines, but ostensibly did not. Our view is further supported by the fact that the SCT did nothing to instigate enforcement proceedings against any business during the relevant time period. The evidence indicates that by law the SCT was required to institute such enforcement if there was evidence of illegality. Instead, the precatory language of even the 1993 SCT letters, stating that the SCT would be "grateful" if MCI suspended the service of its customers, suggests that even to the SCT the services in question were not clearly illegal.

Fifth, because Telmex has no legitimate interest in tying a monopoly over domestic lines to the use of lines outside of Mexico,

we will not construe Mexican law as requiring a permit for the importing of U.S. switching service unless explicitly authorized. No one contends that the relevant laws are this explicit, however. Furthermore, this interpretation conforms with the FCC's extension of comity to foreign law when foreign law is unambiguous.

For all of these reasons, we find ATI's activity in Mexico to be legal during the time in question. Thus it was improper to dismiss ATI's state and federal antitrust claims against SBC and MCI. It is argued that this application of the export exception circumvents the principle that antitrust laws do not extend to other nations' competitive rules. See Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 582 (1986). This would only be true if the legality of the export-import business were not taken into consideration, which it has been. The fact that we find ATI's business to be legal in Mexico is not irreconcilable with Mexican policy designed to protect Telmex from domestic competition, since such a policy is not furthered by banning the import of U.S. reorigination services. Furthermore, Mexican law could have explicitly protected Telmex from even international competition by making it illegal to import U.S. services, which would have been a basis to defeat these antitrust claims.

D. Personal Jurisdiction over Telmex

A federal district court has personal jurisdiction over a nonresident defendant to the same extent as a state court in the

39

state in which the district court is located. See, e.g., Bullion v. Gillespie, 895 F.2d 213, 215 (5th Cir. 1990). The Texas long-arm statute extends to the limits of the Due Process Clause of the Constitution. See Tex. Civ. Prac. & Rem. Code Ann. § 17.042. The exercise of personal jurisdiction thus can be maintained if the nonresident defendant has purposefully availed itself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state, see, e.g., International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945), and if the exercise of jurisdiction over the nonresident defendant does not offend "traditional notions of fair play and substantial justice." Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 113 (1987).

Telmex claims both that it did not have sufficient contacts with the forum state, and that the exercise of jurisdiction over it would be improper because the procedural and substantive policies of Mexico would be affected. Asahi noted that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdiction into the international field." Id. at 115 (internal quotation marks omitted). Asahi, however, was concerned with "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system." Id. at 114. For Telmex, a company that indisputably has engaged in numerous business dealings in the United States, these concerns are de minimis, and even if Mexican policy is relevant on the merits, it is not relevant to the initial determination of personal jurisdiction. If Telmex has broken U.S.

40

law, then requiring Telmex to answer for that would be "fair play."

Thus, there was no personal jurisdiction over Telmex only if Telmex did not have sufficient contacts with Texas and the United States. Minimum contacts can be established either through contacts giving rise to general jurisdiction, or those giving rise to specific jurisdiction. We shall consider these as well as ATI's alternative claim that jurisdiction is authorized under a special provision of the Clayton Act.

## 1. General Jurisdiction

The lower court dismissed the claims against Telmex on personal jurisdiction without an evidentiary hearing. In such instances, the plaintiff satisfies his burden by presenting a prima facie showing of jurisdiction. See <u>Felch v. Transportes Lar-Mex, S.A. de C.V.</u>, 92 F.3d 320, 326 (5th Cir. 1996). Conflicting evidence must be resolved in favor of the plaintiff. See <u>id.</u> (quoting <u>Bullion v. Gillespie</u>, 895 F.2d 213, 217 (5th Cir. 1990)).

General jurisdiction can be assessed by evaluating contacts of the defendant with the forum over a reasonable number of years, up to the date the suit was filed. See <u>Metropolitan Life Insurance Co. v. Robertson CECO Corp.</u>, 84 F.3d 560, 569 (2d Cir. 1996). Telmex's contacts with Texas over the time period from 1990 to 1996 were numerous; the major ones are highlighted here. Up until 1990, Telmex leased telephone circuits between Arizona and Texas. Telmex's current lines interconnect with Texas at the border in

41

McAllen and El Paso. Telmex leased real property in Texas in 1995 and paid taxes to Texas that same year. Telmex contracted to warehouse 75,000 telephone poles in Laredo around 1990-1991. Telmex had correspondent agreements with a number of US carriers. Settlement revenues from these agreements totaled approximately $1 billion a year in 1994-1995. The total revenues derived from Texas residents totaled millions of dollars a month. Telmex also solicited ads for yellow page ads in border cities of U.S., although it is unclear exactly where. Additionally, SBC is alleged to be a Texas contact of Telmex, since SBC owns a portion of a controlling interest in Telmex and thus exerts some control over Telmex.[6]

The district court examined each Telmex contact and in isolation from the others, rather than examining the contacts "in toto" as required. See Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 779 (5th Cir. 1986). In other words, even if a number of different contacts are independent of one another, if they occur with such frequency that the contacts in general are "continuous and systematic," there is general jurisdiction.

The question, then, is whether Telmex's contacts with Texas demonstrate a business presence in Texas sufficient to confer

_____

[6] A number of other contacts are also put forward, mostly involving Telmex paying for services that were provided by corporations in Texas or the U.S. Such services included consulting and finance services. To the degree these contacts involve Texas, they add little to the issue; to the degree they are with other states, they are irrelevant at this juncture. Other contacts, such as Telmex being listed on the NYSE, or designating a NY agent for service of process are also not very informative.

general jurisdiction. The mere renting or ownership of property in a forum is not enough when that property is not used to conduct business in the forum. Cf. Shaffer v. Heitner, 433 U.S. 186 (1977). And while Telmex's other contacts may be continuous and systematic contacts which constitute doing business with Texas, Telmex has virtually no contacts which constitute doing business in Texas. Primarily, Telmex interconnects its Mexican lines with American lines, enabling long distance communication. The money U.S. companies pay Telmex is for service on the Mexican leg of the call; the money the U.S. carriers receive is for the U.S. leg of a call. As such, Mexican and U.S. telecommunications companies do business with each other in these situations, but neither is doing business in the other country for jurisdictional purposes.

The lines Telmex leased from Texas to Arizona also were for the purpose of connecting two points in Mexico and do not constitute doing business in Texas. The fact that SBC owns a portion of a controlling interest in Telmex also adds little to the mix. SBC's 10% interest is not a controlling interest, and typically, the corporate independence of companies defeats the assertion of jurisdiction over one by using contacts with the other. See Hargrave v. Fibreboard Corp., 710 F.2d 1154, 1159 (5th Cir. 1983) ("Generally, our cases demand proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes.").

The one contact that could constitute doing business in Texas

43

would be the yellow page ads.  However, the evidence on the yellow page ads consists of nothing more than a comment that Telmex solicited yellow page ads in border cities in the U.S. without naming which cities, when this occurred, whether such ads actually were actually placed, or for how long.  Without more, such evidence does not help establish continuous and systematic contacts.

It is alleged that MCI sells regular phone service, international 800 service, and private line service for Telmex in Texas.  This would imply a principal/agent relationship from which jurisdiction might arise.  There is no evidence, however, that the provision of service by MCI was on behalf of Telmex but instead it appears to be in the nature of the resale of capacity in Mexico by MCI and the independent provision of capacity in the U.S. by MCI, as explained above with respect to the general interconnection agreements.

The strongest argument for general jurisdiction is that Telmex had arrangements with American carriers to accept telephone signals from Texas, and in order to serve this purpose, Telmex's telecommunications lines crossed into Texas, terminating across the border.  The termination of Telmex's telephone lines in Texas allows for continuous and systematic transfer of calls.  However, despite the apparent force of the argument that such a contact demonstrates a presence in Texas for business purposes, we are bound by Applewhite v. Metro Aviation, Inc., 875 F.2d 491 (5th Cir. 1989), in which such interconnections, even though crossing the

44

border into a forum, were held insufficient to confer general jurisdiction under the Due Process Clause.

In sum, the totality of the contacts suggests that Telmex conducted a great deal of business with Texas, but virtually none in Texas, as such general jurisdiction cannot be shown, even on a prima facie basis.


## 2. Clayton Act Jurisdiction

Because we find that ATI has shown potential U.S. antitrust injury, jurisdiction over Telmex may be obtainable based on nationwide contacts rather than just Texas contacts under the jurisdictional provision of the Clayton Act, 15 U.S.C. § 22. This provision allows for jurisdiction over any federal antitrust suit in any district in which a defendant transacts business, and provides that "all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found." When jurisdiction is invoked under the Clayton Act, the court examines the defendant's contacts with the United States as a whole to determine whether the requirements of due process have been met. See Go Video, Inc. v. Akai Electric Co., Ltd., 885 F.2d 1406 (9th Cir. 1989).

However, while there may be some additional evidence of Telmex doing business with the U.S., there is no evidence qualitatively difference on the subject of doing business in the U.S. for what we deem to be a relevant time period from 1990 to 1996. Thus, Clayton

45

Act personal jurisdiction over the antitrust claims is also unavailable.

### 3. Specific Jurisdiction

ATI maintains that specific jurisdiction over Telmex arises because Telmex "purposefully directed its activities to residents of Texas (ATI and over 80 other resellers)." As ATI recognizes, specific jurisdiction over a nonresident exists when the defendant "purposefully avails" itself of the privilege of conducting activities in the forum, and the plaintiff's cause of action arises out of or relates to that act. See Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985). By working through SBC and MCI to obtain the numbers of resellers, ATI maintains, Telmex purposefully availed itself of the forum.

While Telmex did not conduct much business in Texas, it conducted a high volume of business with Texas and Texas corporations. It was this business with which Telmex was concerned when Telmex allegedly canceled ATI's numbers. Such actions, if done without a legal right, may amount to violation of U.S. law. The issue of whether they were legally privileged, however, is not before us, and such a defense would not defeat personal jurisdiction. Thus, if the allegations against Telmex are true, then Telmex may have violated U.S. antitrust law by harming a Texas business through the willful cancellation of a necessary portion of that business's service. Such actions would have reasonably

46

foreseeable consequences in Texas.

It is no use to say that ATI's location in Texas was "fortuitous." ATI had to be located somewhere and Telmex knew where that was and directed its actions toward Texas by canceling phone service linked to Texas. Telmex's lines ran right up and into Texas for the express purpose of serving Texas residents with Mexican phone service, a service which it received millions of dollars a month in revenue. The allegation that Telmex shut down these lines in order to harm a Texas business whose services were legal in Mexico suffices to confer personal jurisdiction over Telmex for the injuries suffered in Texas. The equivalent result would hold if an electric company sent an electric spike through its lines, damaging computers on the other end, even if that company's lines did not carry the spike all of the way to its destination.

By conducting a large volume of business with Texas through contracts carefully drafted to avoid subjecting Telmex to general personal jurisdiction in Texas, Telmex may have avoided doing business in Texas, but it made sufficient contacts with Texas and received sufficient benefits that personal jurisdiction in Texas is proper to answer for the consequences of the actions it allegedly took, directed toward Texas, to protect its business with Texas.

## E. Discovery

ATI complains discovery was improperly limited. The district

court stayed discovery on everything except jurisdictional issues and never lifted the stay.  ATI contends that it was reversible error for the district court to grant summary judgment for SBC and MCI on all of ATI's causes of action without allowing discovery on substantive issues.

ATI points to SBC's assertion of the <u>Copperweld</u> doctrine, which requires a factual determination as to whether a monopolistic conspiracy occurred between economic competitors.  This doctrine was asserted for the first time in SBC's motion for summary judgment.  ATI complains that it was unable to investigate the relationship between SBC and Telmex for the purpose of this doctrine.  ATI also complains it was unable to investigate the anticompetitive effect in the United States of the defendants' conduct.  In particular, ATI points to the fact that the district court ruled against ATI on the issue of relevant market, without affording ATI the opportunity to pursue the issue through discovery.  The issue of relevant market is a fact question.  <u>See, e.g.</u>, <u>C.G. Services, Inc. v. Control Data Corp.</u>, 759 F.2d 1241 (5th Cir. 1985); <u>Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.</u>, 732 F.2d 480 (5th Cir. 1984).

ATI has waived the issue of inadequate discovery with respect to SBC.  Under Federal Rule of Civil Procedure 56(f), the appropriate way to raise the issue is for the party opposing the motion for summary judgment to file a motion for a continuance with an attached affidavit stating why the party cannot present by

48

affidavit facts essential to justify the party's opposition. ATI did not do this with respect to SBC.

MCI made such a motion, but the district court denied it. To obtain a continuance of a motion for summary judgment, a party must "specifically explain both why it is currently unable to present evidence creating a genuine issue of fact and how a continuance would enable the party to present such evidence." Liquid Drill, Inc. v. U.S. Turnkey Exploration, Inc., 48 F.3d 927, 930 (5th Cir. 1995). The non-moving party may not simply rely on vague assertions that additional discovery will produce needed, but unspecified, facts in opposition to summary judgment. See Daboub v. Gibbons, 42 F.3d 285, 288 (5th Cir. 1995). If it appears that further discovery will not provide evidence creating a genuine issue of material fact, the district court may grant summary judgment. See Resolution Trust Corp. v. Marshall, 939 F.2d 274, 278 (5th Cir. 1991).

ATI failed to specify its intended discovery or how such discovery would assist it in opposing summary judgment in favor of MCI. ATI failed to identify who could provide information relevant to the issues other than witnesses who had already been deposed one or more times before.

When a party is not given a full and fair opportunity to discover information essential to its opposition to summary judgment, the limitation on discovery is reversible error. See Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986). ATI, however,

49

has not persuasively indicated that it was deprived of any relevant information with respect to MCI. Cf. RTC v. Marshall, 939 F.2d 274, 278 (5th Cir. 1991) (requiring the nonmovant to show how additional discovery would lead to unresolved issues of fact). For these reasons, it was proper for the district court to deny additional discovery.

## IV.

For the forgoing reasons, we REVERSE the district court's grant of summary judgment to MCI and SBC on the substantive issues in this case, we REVERSE the dismissal of Telmex on personal jurisdiction, and we REVERSE the denial of partial summary judgment to ATI on the issue of the lawfulness of its activities in Mexico. We REMAND this case to the district court for additional proceedings consistent with this opinion.

REVERSED AND REMANDED.